02-12-180-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00180-CV

 

 


 
 
 In the Interest of R.L.G., Jr., A Child
 
 
  
 
 
  
 
 
 
 
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

FROM THE 393rd
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
R.L.G. Sr. (Father) appeals from the trial court’s judgment terminating his
parental rights to his eight-year-old son, R.L.G. Jr. (R.L.G.).  B.R.C.
(Mother) does not appeal from the trial court’s termination of her parental
rights to R.L.G.  Because we hold that the evidence is factually sufficient to
support the termination, we affirm the trial court’s judgment.

In part
of his issue, Father challenges his affidavit of voluntary relinquishment on
the ground of incompetence.  In addition to finding that termination of the parent-child
relationship was in R.L.G.’s best interest and that Father had executed an irrevocable
affidavit of relinquishment, however, the trial court also found that Father
had

·                   
knowingly
placed or allowed R.L.G. to remain in conditions or surroundings which endangered his physical or emotional well-being;

·                   
failed
to comply with the provisions of a court order that
specifically established the actions necessary for him to obtain the return of R.L.G.,
who had been in the temporary managing conservatorship of the Texas Department
of Family and Protective Services (TDFPS) for not less than nine months as a
result of his removal from Father for abuse or neglect; and

·                   
constructively
abandoned R.L.G., who had been in the temporary managing
conservatorship of TDFPS for not less than six months, and TDFPS made
reasonable efforts to return R.L.G. to Father, Father did not regularly visit
or maintain significant contact with R.L.G., and he demonstrated an inability
to provide R.L.G. with a safe environment.[2]

Father
did not challenge these three findings.  Along with a best interest finding, a
finding of only one ground alleged under section 161.001(1) is
sufficient to support a judgment of termination.[3]  We therefore overrule
this portion of his issue.[4]

In
the remainder of his issue, Father contends that the evidence is factually
insufficient to support the trial court’s finding that termination of his
parental rights is in R.L.G.’s best interest.

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”[5] 
“While parental rights are of constitutional magnitude, they are not absolute. 
Just as it is imperative for courts to recognize the constitutional underpinnings
of the parent-child relationship, it is also essential that emotional and
physical interests of the child not be sacrificed merely to preserve that
right.”[6]

In a
termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except for the
child’s right to inherit.[7] 
We strictly scrutinize termination proceedings and strictly construe
involuntary termination statutes in favor of the parent.[8]

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.[9]

Termination
decisions must be supported by clear and convincing evidence.[10]  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”[11]  Due process
demands this heightened standard because termination results in permanent,
irrevocable changes for the parent and child.[12]

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.[13]  We determine
whether, on the entire record, the factfinder could reasonably form a firm
conviction or belief that the termination of the parent-child relationship
would be in the best interest of the child.[14] 
If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.[15]

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.[16] 
Prompt and permanent placement of the child in a safe environment is also presumed
to be in the child’s best interest.[17] 
The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the
harm to the child;

(4) whether the child has been the victim of repeated
harm after the initial report and intervention by the department or other
agency;

(5) whether the child is fearful of living in or
returning to the child’s home;

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7) whether there is a history of abusive or assaultive
conduct by the child’s family or others who have access to the child’s home;

(8) whether there is a history of substance abuse by the
child’s family or others who have access to the child’s home;

(9) whether the perpetrator of the
harm to the child is identified;

(10) the willingness and ability of the child’s family to
seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the child’s family to
effect positive environmental and personal changes within a reasonable period
of time;

(12) whether the child’s family demonstrates adequate
parenting skills, including providing the child and other children under the
family’s care with:

(A) minimally adequate health and
nutritional care;

(B) care, nurturance, and appropriate discipline
consistent with the child’s physical and psychological development;

(C) guidance and supervision consistent with the child’s
safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even
though the violence may not be directed at the child; and

(F) an understanding of the child’s needs and
capabilities; and

(13) whether an adequate social support system consisting
of an extended family and friends is available to the child.[18]

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional
and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child
now and in the future;

(D)     the parental abilities of the individuals seeking
custody;

(E)     the programs available to assist these
individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or
by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may
indicate that the existing parent-child relationship is not a proper one; and

(I)      any excuse for the acts or omissions of the
parent.[19]

These
factors are not exhaustive.[20] 
Furthermore, undisputed evidence of just one factor may be sufficient in a
particular case to support a finding that termination is in the best interest
of the child.[21] 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.[22]

Findings
of fact are the exclusive province of the factfinder.[23]  Findings of fact entered in
a case tried to the court have the same force and dignity as a jury’s answers
to jury questions.[24]
 The trial court’s findings of fact are reviewable for legal and factual
sufficiency of the evidence to support them by the same standards that are
applied in reviewing evidence supporting a jury’s answer.[25]

But
when findings of fact are filed and are unchallenged, they occupy the same
position and are entitled to the same weight as the verdict of a jury; they are
binding on an appellate court unless the contrary is established as a matter of
law or there is no evidence to support the finding.[26]

In
addition to the ultimate findings located in the decree, the trial court also entered
the following unchallenged findings of fact,

12.     The Court finds the testimony
of Stephanie Kolb, Adam Soyars, [Mother], Katrina Young, and Amanda Mention to
be credible.

13.     [Father and Mother’s]
relationship was characterized with frequent arguments, involving yelling and
screaming, in the presence of [R.L.G.] and [T.M., Father’s teenage daughter].  [Father
and Mother] engaged in throwing items and breaking items during arguments.

14.     [Father and Mother] engaged in
physical fighting in the presence of [R.L.G.]

15.     [R.L.G.] yelled and screamed
at [Father and Mother] to stop and would physically intervene during the
arguments between [them].

16.     [Father and Mother] engaged in
recurring illegal drug use, including, cocaine, marijuana, and
methamphetamines, in the presence of and while caring for [R.L.G.]

17.     Drug use by [Father] began
when [R.L.G.] was an infant.

18.     [Father] was aware of
[Mother’s] recurring illegal drug use; yet, he permitted [] her to care for
[R.L.G.]

19.     [Mother] engaged in recurring
prescription drug abuse in the presence of and while caring for [R.L.G.]

20.     [Father] engaged in recurring
prescription drug abuse in the presence of and while caring for [R.L.G.]

21.     [Father] illegally sold his
prescription pain medication in the presence of [R.L.G.] numerous times.

22.     [Father and Mother]
experienced instability in their housing situation, moving approximately 20
times with [R.L.G.]

23.     [Father and Mother] depended
on family members and community resources to meet their needs and the child’s
needs.

24.     [R.L.G.] attended numerous
schools due to his frequent moves in residences while living with his parents.

25.     [R.L.G.] displayed destructive
behaviors while living with his parents . . . .  Those behaviors include[]
throwing items; temper tantrums; yelling and screaming; hitting and punching
himself; and crying excessively.

26.     [R.L.G.] was diagnosed with
ADHD while in the care of his parents.

27.     [Mother and Father] did not
provide consistent mental health treatment for [R.L.G.’s] ADHD.

28.     [Mother] overdosed on
prescription medication in late December 2009 in the presence of [R.L.G.]

29.     Prior to [her] overdose in
December 2009, [Father] was aware of [Mother] abusing various prescription
medications and continued to allow [her] to have unsupervised access to
[R.L.G.]

30.     [B.G.], a brother to [Father],
has a history of drug abuse and his parental rights to his own children were
terminated.

31.     [D.G.], the wife to [B.G.],
has a history of drug abuse and her parental rights to her children were
terminated.

32.     [Father] permitted [B.G. and
D.G.] to have contact with [R.L.G.], including staying at his residence
overnight.

33.     [TDFPS] received a referral on
or about January 7, 2010 regarding [Mother, Father, T.M., and R.L.G.]

34.     Stephanie Kolb, an employee of
[TDFPS], investigated the report and spoke to [Mother, Father, T.M., and
R.L.G.]

35.     [T.M.] is the daughter of
[Father] and the half sibling to [R.L.G.]  She was living in the home with
[Father, Mother, and R.L.G.]

36.     [T.M.] was previously
diagnosed with a mental health disorder and had a history of acting out
violently.  [Father] did not provide consistent mental health treatment for
[her].

37.     [Father] was diagnosed with
Bipolar Disorder in 2008.

38.     [Father] admitted to Stephanie
Kolb that he was not taking his prescription medication for his Bipolar Disorder.

39.     [TDFPS] provided Family Based
Safety Services to the family, consisting of [Mother, Father, T.M., and R.L.G.]

40.     During the time [TDFPS] was
offering Family Based Safety Services to [Father], he began a relationship with
Misty Crader.  Misty Crader met [Father] after her inpatient hospitalization at
Wichita Falls State Hospital, a mental health hospital.

41.     [Father] allowed Misty Crader
and her children to move into the residence with him and [R.L.G.] after knowing
her for only several weeks.

42.     Misty Crader was at the time
and is currently on probation for Injury to a Child for striking her own child.

43.     On September 30, 2010, [Father
and Mother] agreed to an Order to Participate in Services.  The order
prohibited [Father] from permitting Misty Crader contact with [R.L.G.] unless
approved by [TDFPS].

44.     On October 1, 2010, [Father]
permitted Misty Crader to have contact with [R.L.G.]

45.     On October 6, 2010, [Father]
and Misty Crader discussed with Katrina Young the process to withdraw a child
from the school district and transfer the child to Missouri schools.

46.     [TDFPS] removed [R.L.G.]
pursuant to court order under Tex. Fam. Code §262.102 on October 6, 2010.

47.     An adversary hearing was held
on October 29, 2010.  [Father and Mother] appeared in person and with counsel. 
The Court entered temporary orders appointing [TDFPS] as temporary managing
conservator of [R.L.G.] and made the requisite findings under Tex. Fam. Code
§262.201.

48.     On October 29, 2010, the Court
entered temporary orders that specifically established the actions necessary
for [Mother and Father] to obtain the return of [R.L.G.]

49.     On October 29, 2010, [Father]
was ordered by the Court to participate in the following services:

a psychological evaluation and follow the recommendations
of the psychological evaluation;

participate in individual counseling and follow any and
all recommendations and continue until no further sessions are necessary;

participate in a drug/alcohol assessment and follow any
and all recommendations;

participate in parenting classes until completion;

submit to drug testing at the request of [TDFPS]; and

to participate in an intake/ evaluation at Denton County
Mental Health Mental Retardation for treatment of his Bipolar disorder.

[Mother] was ordered to participate in substantially the
same services.

50.     [Mother and Father] were court
ordered to establish and maintain safe and suitable housing and refrain from
engaging in criminal activity.

51.     [Mother and Father] were court
ordered to establish and maintain suitable employment for a period of at least
six months and continue through the pendency of the suit.

52.     [Father] was ordered to have
two visits weekly with [R.L.G.]  [Father] missed over half of his visits with
the child over the pendency of this case.

53.     [Father] has not regularly
visited or maintained significant contact with [R.L.G.]

54.     [TDFPS] established
counseling, parenting, drug treatment services, and a psychological evaluation
for [Father] in Texas.

55.     [R.L.G.] was returned to the
care of [Mother] in June 2011 and the Court modified the temporary orders under
Tex. Fam. Code §263.403.  In November 2011, [R.L.G.] was removed from the
returned care of [Mother] after her overdose on prescription pills and the
Court modified the temporary orders and established a new dismissal date.

56.     [Father] moved several weeks
after the adversary hearing out of state to Missouri with Misty Crader. 
[Father] moved residences multiple times during the case.

57.     [Father’s] plan for [R.L.G.]
includes living with Misty Crader and her children.  Misty Crader’s daughter
has a history of mental health hospitalizations and acting out aggressively.

58.     Misty Crader has a history of
marijuana use.  Misty Crader has a history of not taking her prescription
medication for treatment of her Bipolar Disorder.  Misty Crader has a history
of suicide attempts.  Misty Crader has a prior history with [TDFPS].  Misty
Crader has prior criminal charges involving assault in Missouri.

59.     [Father] threatened suicide in
February 2012 and had a suicide plan developed.

60.     [Father] has demonstrated an
inability to provide [R.L.G.] with a safe and stable environment.

61.     [Father] did not successfully
complete all of the services . . . which the court ordered.

62.     [Father] has not been employed
since approximately 2008.  [He] has no independent means to support a child.

. . . . 

66.     [TDFPS] made reasonable
efforts to return the child to [Father and Mother].

67.     [TDFPS’s] plan for [R.L.G.] is
adoption by a non-relative.

68.     [R.L.G.] has appeared happier
and less anxious since placement in his new foster home.

69.     [R.L.G.] needs a safe and
stable environment to thrive emotionally.

. . . . 

The
record contains evidence to support all of these unchallenged findings;
accordingly, we are bound by them.[27]

Additionally,
Mother, who voluntarily relinquished her rights, testified that she had learned
that children with ADHD need structure and that she did not believe that Father
could give R.L.G. that structure because “[Father] always puts himself first.  He
never thinks of [R.L.G.]  A good example, he moved to Missouri instead of
staying in Texas.”  Mother also testified that she believed that Father’s
parental rights to R.L.G. should be terminated “[b]ecause he cannot provide for
[R.L.G.] mentally, physically, [and] stably.”  She stated that she and Father
“both do more harm to [R.L.G.] than good [and] always have.”  She further
stated that it would not be in R.L.G.’s best interest to be with Father
because, in her opinion, Father could not provide for him, would not
appropriately supervise him, chose to leave him with inappropriate caregivers,
and was not always protective of him.  She also did not believe that Father
would be vigilant enough to make sure that R.L.G. took his medicine properly.

Mother
testified that “since [R.L.G. has] been placed in the foster home that he’s in
now, he’s a lot happier.  He’s less anxious.  He talks about his foster dad all
the time.  He’s very comfortable with him.  And [she] believe[s] [that R.L.G.
is] finally getting the support and stability that he needs.”  She also
testified that she believes that R.L.G. “wants to remain in the custody of his
foster parents.”  “He talks about [his foster dad] all the time.  He’s very
happy.  He calls him dad.  He needs structure.  He’s getting structure.”

Consequently,
reviewing all the evidence and giving due deference to the trial court’s
findings, we hold that the evidence is factually sufficient to support the
trial court’s best interest finding.

We
overrule the remainder of Father’s sole issue and affirm the trial court’s
judgment.

 

PER CURIAM

 

PANEL: 
DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DELIVERED:  September 20,
2012

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-12-00180-CV

 

 


 
 
 In
 the Interest of R.L.G., Jr., A Child
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 393rd District
 Court
  
 of
 Denton
 County (2010-61378-393)
  
 September
 20, 2012
  
 Per
 Curiam
 
 


 

JUDGMENT

 

This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

PER
CURIAM








 

 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(D), (N)–(O) (West Supp. 2012).





[3]In re A.V., 113
S.W.3d 355, 362 (Tex. 2003); In re E.M.N., 221 S.W.3d 815, 821 (Tex.
App.—Fort Worth 2007, no pet.).





[4]See Tex. Fam. Code
Ann. § 161.001(1)(N)–(O), (2); A.V., 113 S.W.3d at 362; In re K.W.,
335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.).





[5]Santosky v. Kramer,
455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115
S.W.3d 534, 547 (Tex. 2003).





[6]In re C.H., 89
S.W.3d 17, 26 (Tex. 2002).





[7]Tex. Fam. Code Ann. § 161.206(b)
(West 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).





[8]Holick, 685 S.W.2d
at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no
pet.).





[9]Tex. Fam. Code Ann. § 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).





[10]Tex. Fam. Code Ann. § 161.001;
see also id. § 161.206(a) (West 2008).





[11]Id. § 101.007
(West 2008).





[12]In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).





[13]In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006).





[14]Tex. Fam. Code Ann. § 161.001;
C.H., 89 S.W.3d at 28.





[15]H.R.M., 209 S.W.3d
at 108.





[16]In re R.R., 209
S.W.3d 112, 116 (Tex. 2006).





[17]Tex. Fam. Code Ann. § 263.307(a)
(West 2008).





[18]Id. § 263.307(b);
R.R., 209 S.W.3d at 116.





[19]Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).





[20]C.H., 89 S.W.3d at
27.





[21]Id.





[22]Id.





[23]Bellefonte
Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744–45 (Tex. 1986).





[24]Anderson v. City of
Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).





[25]Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994).





[26]McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986); Rischon Dev. Corp. v. City of Keller,
242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), cert. denied,
555 U.S. 996 (2008).





[27]See McGalliard,
722 S.W.2d at 696; Rischon Dev. Corp., 242 S.W.3d at 166.